IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

BRIAN D. OWENS                                        PLAINTIFF

              v.                    Civil No. 09-5248

CORPORAL T. SCOTT                                     DEFENDANT

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

This is a civil rights action filed by the Plaintiff, Brian D. Owens, pursuant to the provisions of 42 U.S.C. § 1983. Owens proceeds *pro se* and *in forma pauperis.*

Owens is currently incarcerated in the Arkansas Department of Correction (ADC). However, the claim before me arises out of Owens' incarceration at the Washington County Detention Center (WCDC). Specifically, Owens is suing Corporal Scott in her individual capacity,[1] claiming that Scott revoked his trustee status in retaliation for filing this lawsuit and for submitting grievances.

Scott filed a motion for summary judgment (Docs. 49-51). An evidentiary hearing was held on April 2, 2012. At the conclusion of the hearing, a transcript was ordered. The transcript has been received (Doc. 69) and the case is ready for decision.

### 1.  Applicable Standard

A jury demand has been made in this case. A pretrial evidentiary hearing may be utilized to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Johnson v. Bi–State Justice Center, 12 F.3d 133, 135 (8th Cir. 1993)(quoting Anderson v. Liberty Lobby, Inc., 477 U.S.

---

[1]Official capacity claims were dismissed on August 8, 2011 (Doc. 33).

242, 251-52 (1986)).  When both sides present evidence, the procedure "resembles a summary judgment motion with live evidence." Id.  The Court must avoid credibility determinations, believe the Plaintiff's evidence, and draw all justifiable inferences in the Plaintiff's favor.  Id. at 136.

### 2.  Testimony and Evidence Presented

The testimony of the following individuals was taken: (1) Carey Madewell; (2) Jake Loudermilk; (3) Douglas Crowley; (4) Billy Lehman; (5) Brian Owens, the Plaintiff; (6) Tiffaine Scott, the Defendant; (7) Tom Mulvaney; (8) Randall Denzer; and (9) Brian Roy.  For purposes of discussion, the testimony of these witnesses will be summarized.

### Brian Owens

Owens testified that he was detained at the WCDC from August 28, 2009, until February 28, 2010.[2] Transcript (hereinafter Tr.). at pg. 47. He testified he first became a trustee in September of 2009 and was assigned to the day shift in B pod utility.  Id. at pg. 48; Defendant's (hereinafter Deft's)  Ex. 3.

On October 22nd, Owens was returning to the trustee pod, U pod, to use the restroom when Scott asked him what they needed to do to "clear up" the problem they had.  Tr. at pg. 48.  When he asked what problem, Scott stated that Owens had only been working two hours and already needed to use the restroom.  Id.  Owens denied having a medical problem.  Id.  Scott stated that she could fire him as a trustee and then he would be around the bathroom twenty-four hours a day.  Id. at 49. Owens proceeded to the restroom and later that day he filled out a grievance regarding Scott's behavior.  Id.  He gave the grievance to Sergeant Whittington.  Id. at pg. 55.  Owens received a response to his grievance.  Id. at pg. 56.

---

[2]Owens' booking sheet indicates that he was actually released on February 25, 2010.  Deft's Ex. 1.

Owens does not have a copy of this grievance and did not have a copy when he filed the complaint.  Tr. at pgs. 55-56.  Instead, he asserts that when he wrote to the Court Clerk to obtain § 1983 forms, he included the original October 22nd grievance.  Id.  Despite having requested a copy of it on several occasions, Owens indicated he has never received a copy of the grievance back from the Court. Id. at pg. 56.  Owens' testimony is consistent with the explanation given in his complaint as to why he did not have a copy of the grievance.  (Doc. 1 at pg. 2.)  The Court could not locate the grievance.  As explained at the hearing, at the time in question, the Court Clerk's office did not retain inmate correspondence longer than a couple of years and did not return attachments to correspondence, such as grievances, to inmates.  The Court's Clerk's office has since changed its practice and now returns attachments to correspondence to inmates.  Tr. at pg. 85.

Owens testified that the day after filing the grievance against Scott,  Scott entered the trustee pod and took away the privileges from the trustees, including the television, the Kool-aid, the 190 degree water and the DVDs.  Tr. at pg. 49.  When the trustees asked why Scott was taking their privileges away, Scott replied that they could thank Owens for it.  Id.  A few hours later, the items were returned.  Id. at pg. 58.

Owens testified that on November 2nd, he pulled a muscle in the middle of his lower back while transferring a fifty gallon tea jug, weighing between 150 to 200 pounds, from one cart to another.  Tr. at pgs. 49 & 63-64 & 87. Usually two trustees lift the jug.  Id. at pg. 64.  This occurred around lunch time and he stopped working for the day.  Tr. at pg. 87.  Owens submitted a medical request stating that he had injured his back and needed to see a nurse.  Id. at pg. 49; Plff's Ex. 1; Deft's Ex. 5.  On November 3rd, the nurse prescribed Owens ibuprofen, 600 mg, for seven days and

noted that Owens stated that he was "unable to work." Tr. at pg. 49. According to Owens, he was on the waiting list to see the doctor, but was never seen by the doctor for his back. Id. at pgs. 49-50.

Owens did not work on November 3rd and did not speak to any member of the jail staff about whether he needed to work that day. Tr. at pg. 87. However, Owens submitted as an exhibit a grievance dated November 3rd in which he stated that "[p]er 'Nurse' Rhonda he was to work today after being hurt on the job less than 2 days ago." Plff's Ex. 2; Deft's Ex. 6. He testified that he was told if he did not work he would be put on lock down. Tr. at pgs. 62, & 68. Owens requested a § 1983 form so he could file a lawsuit. Id. at pgs. 56-57.

November 4th was Owens' scheduled day off and Owens was in the trustee pod.[3] Tr. at pg. 50. At around 7:00 or 7:30 a.m., while Owens was sleeping, Scott came over the intercom and asked Owens to work. Id. at pgs. 50 & 59. Owens testified he told Scott that it was his day off, he was hurt, and could not "even hardly stand up." Id. at pgs. 49-51. Scott responded that she did not care. Id. at pg. 50. Owens testified he then told Scott that he thought she was being retaliatory because of the grievance and lawsuit he filed against her. Id. According to Owens, Scott responded that she did not care that he was filing the lawsuit. Id.

At some point, Scott came down to the cell and told Owens to get up and go to work or go to lock-down. Tr. at pg. 62. When Owens asked for a sergeant, Scott told him to pack up his belongings because he was going to lock-down. Id. Owens testified that, prior to noon, Scott had Deputy Loudermilk escort him to A pod, a lock-down pod.[4] Id. at pgs. 49 & 72.

---

[3] The trustee rules provide that "[t]rustees will stay in their assigned living area during their day off or while not working unless instructed by a Deputy." Deft's Ex. 2.

[4] Plaintiff's Exhibit 4 and 5 show that on November 4, 2009, Owens was initially in U Block at 6:19 a.m. but at 2:50 p.m., Owens was moved to L Block. Defendants records also indicate Owens was moved to L block on November 4th. Deft's Ex. 12.

On November 5th, Owens submitted a grievance stating that he had filed a § 1983 suit against Scott a couple of weeks ago and she had found out about it. Plff's Ex. 3. As a result, he stated that she had tried to make him work on his scheduled day off. Id. In response, Owens was referred to the Trustee Rules of Conduct, which provided that trustees would be asked to work on their days off when necessary. Id.

With respect to the filing of the lawsuit, Owens had the account certificate portion of the IFP application completed by jail personnel on October 26, 2009, approximately eight days before he was removed from trustee status. Doc. 2 at pg. 2. The complaint was received by the Court on October 30, 2009. Id.

Owens believed there were already three trustees working in B pod that day–Billy Lehman, Douglas Crowley, and Stephen Goodman. Tr. at pg. 60. Owens testified that he was unable to work on November 4th. Id. at pg. 88. However, he testified that he was only temporarily unable to do the job and did not feel the jail should have punished him by removing him from trustee status. Id. Owens believed that he should have remained a trustee until he was cleared to go back to work. Id. at pg. 89.

Owens testified that in A-pod, inmates were only allowed to sleep from 9:00 p.m. until 6:00 a.m. and then were locked out of their cells. Tr. at pgs. 90 & 94. In other pods, the inmates were allowed to sleep all day if they wanted to and they had access to commissary. Id. at pg. 94.

After a couple of weeks, Owens began feeling better and asked to be made a trustee again. Tr. at pgs. 90-91. His request was approved and he was made trustee again on December 9, 2009. Deft's Ex. 3.

With respect to days off, the trustee rules provide:

Unless you are asleep on your day off, you will be expected to perform your job assignment.  Trustees are given one day off per week after being a trustee for seven days.  If you choose to work on your days off you will not be able to make the day up. You may have to work part or all of your day off during shortages of trustees in order to cover all jobs.

Deft's Ex. 4.

### Carey Madewell

Madewell testified he was incarcerated in the WCDC for approximately four months in 2009. Tr. at pg. 12.  During his incarceration, he was a trustee.  Id.  A list was posted in the kitchen listing the trustees assigned to work on each day and who had the day off.  Id. at pg. 20.

Owens was also a trustee while Madewell was at the WCDC.  Tr. at pg. 13.  Madewell recalled Owens being removed as a trustee because he could not go to work, but Madewell could not recall who removed Owens from trustee status.  Id. at pgs. 13-14 & 18.  Madewell testified that he understood that a trustee was expected to work when asked.  Id. at pg. 19.  However, if a trustee was unable to work for a medical reason, he could  put in a request for medical attention and could be excused from working.  Id. at pgs. 17-19.  Another trustee who had the day off would cover for the sick trustee.  Id. at pg. 19.  Madewell testified that he was aware of a trustee who was burnt and allowed to stay a trustee for over three months even though he never moved off his bunk.  Id. at pg. 17.

Madewell testified that he remembered Scott taking some items away from the trustees, including the remote for the television and the 190 degree water.  Tr. at pgs. 15 & 17.  The trustees were not allowed to watch TV or make anything to eat.  Id.  The trustees were told they could thank Owens for this.  Id.

-6-

**Douglas Crowley**

Crowley testified that he was in the WCDC in 2009 and served as a trustee.  Tr. at pg. 30. Crowley and Owens were both assigned to B pod utility in November of 2009.  Id.   Crowley believed there were three or four trustees assigned to B pod.  Id. at pg. 34.   Crowley had no involvement in deciding how many trustees were assigned to this job.  Id. at pg. 40.   He never refused to work when told to do so.  Id.  He testified that even if it was your day off, if they were not fully staffed, you might have to work.  Id. at pg. 42.

The trustees mopped the hallways, passed out lunch and dinner, passed out uniforms, exchanged sheets and blankets, and passed out toilet paper in the seven pods.  Tr. at pg. 34.  Crowley testified it was a big job for only two trustees.  Id. at pg. 39.  The day shift was 6:00 a.m. to 6:00 p.m.[5]; Night shift was 6:00 p.m. to 6:00 a.m.  Id. at pg. 35.

On November 4th, when Crowley returned to the trustee pod, Owens was no longer a trustee. Id. at pg. 32.  However, Crowley did not know exactly what had happened.  Id.

Crowley recalled that something was happening between Scott and Owens.  Tr. at pg. 32. However, he could not recall what occurred but knew that Owens felt he had been done wrong.  Id.

**Billy Gene Lehman, Jr.**

Lehman testified he was incarcerated in the WCDC in 2009.  Tr at pg. 44.  He was a trustee assigned to B pod utility.  Id.  He worked the day shift and there were usually two other trustees on that shift.  Id. at pg. 46.  Lehman recalled Owens saying "something" about his back hurting.  Tr. at pg. 44.

---

[5] Other testimony indicates the day shift started at 7:00 a.m.  See Tr. at pg. 127.

**Tiffaine Scott**

Scott is employed at the WCDC and was employed there in November of 2009. Tr. at pg. 96. Scott testified there have been a few trustees she fired because they did not want to work on their day off. Id.

In the incident report prepared by Scott on November 4th, she stated:

On 11/4/09, I noticed that we only had two trusties [sic] on the floor working. I asked J. Loudermilk how many trusties he had. Loudermilk said "I'm not sure." I then asked one of the trusties how many was down there. Trusty Goodman told me two, because today was Trusty Owens ... day off.... Sunday afternoon during feeding of dinner, I was told Owens hurt his back lifting a tea pitcher. I asked one of the floor deputies to find out if he put a medical request in to see the nurse. Deputy Loudermilk said "I think he did I'm not for sure." ... I called Cpl. Roy ... and asked for another trusty on B-pod utility. I explained what I heard about Owens situation and told him that the nurse did doctor call, but she did not have a request from Owens. Cpl. Roy said he needed to come down to work. I asked one of the male floor deputies to go tell Owens that he had to work. I was then told he couldn't get off his bunk. At lunch time feeding [on November 3rd][6], I noticed Owens standing in front of the tv. On 11/4/09, I called into U-blk and told Owens he needed to come to work. Owens said "today is my day off." I told Owens it doesn't matter they are really busy and they need some help. He said who am I speaking with, and I said, "this is Miss. Scott would you like to speak with me?" I went to U-blk Owens start[ed] saying I was singling him out because he was suing me. I told Owens I could care less about him suing me, but if he didn't come to work he could go pack his stuff. Owens said "I want to speak with a sergeant." I said, "sure you can after you put in a request, but right now I'm done standing here arguing with you." I told Owens he could go pack his stuff. Trusty Owens was removed from trusty status do [sic] to arguing with a deputy and refusing to go to work.

Defts' Ex. 7.

When questioned by her counsel at the hearing as to whether she remembered "anything like this bathroom incident that Mr. Owens testified about," Scott testified that she did not and that she never saw any grievance about such an incident. Scott denied that she ever removed any items from

---

[6]Owens does not believe Scott was working on November 3rd. Tr. at pg. 131. However, Defendant submitted a post-hearing exhibit that establishes Scott did in fact work on November 3rd. (Doc. 63).

the trustee pod as alleged by Owens.  Scott testified that she did not become aware that Owens had

sued her until after he was removed from trustee status on November 4, 2009, explaining that it

was"last year, or maybe the year before last" that she became aware of the lawsuit.  Tr. at pg. 98-99.

Scott acknowledged that Owens had, on November 4th, stated that he was going to sue her, but

denied that she had made any attempt to confirm whether he had, in fact, sued her.  In an affidavit

submitted in support of Defendant's Summary Judgment Motion (Doc. 27-8), Scott stated:  "Prior

to November 4, 2009, I had received second-hand information that the Plaintiff had filed a lawsuit

against me, however, I did not know if what I had heard was true, and had made no attempt to verify

if the Plaintiff had in fact sued me."  (Id. ¶ 21.)  At the hearing, Scott explained that the "second hand

information" was from another deputy, whose name she did not recall, who told her that Owens "was

going to sue" her.  Tr. at pg. 100.  Upon questioning by the undersigned, Scott explained that her

affidavit was "worded wrong," as the deputy had told her that Owens "was going to sue" her, not that

he had, in fact, sued her.

        The undersigned questioned Scott about her incident report, in which she stated that when

she asked if Owens had submitted a medical request,  Deputy Loudermilk said, "I think he did I'm

not for sure."  The undersigned asked Scott to explain why, given Deputy Loudermilk's statement,

she then went on in her incident report to state that she told Corporal Roy "that the nurse did doctor

call, but she did not have a request from Owens."  Defs's Ex. 7.  The undersigned also asked Scott

to explain why, in her affidavit, she stated that "Deputy Loudermilk was not able to state with

certainty whether or not the Plaintiff had submitted a medical request."  (Doc. 27-8 ¶ 9.)  Scott

testified as follows to the undersigned's questions:

Q.      ...  I don't understand why you would have reported to Corporal Roy that
        [Owens] did not submit a medical request when Loudermilk said "I think he
        did."

A.      But he wasn't sure that he did.

Q.      Well, why didn't you go confirm it then?

A.      I should have.

Q.      ... Why didn't you tell Corporal Roy exactly what Loudermilk said?
        Loudermilk thinks he did, but he's not sure.

A.      I should have said that....

Q.      ... Did you check with the nurse?

A.      I did not.

Q.      So how did you come up with that statement when you told Corporal Roy
        that [the nurse did not have a medical request from Owens]?

A.      Because the nurse did not go to U block to do sick call, I don't believe, that
        morning....

Q.      That doesn't mean that he didn't submit it, as he in fact did, two days before
        and ... go to sick call the day before.

A.      Right.

Q.      So, again, tell me ... why you would make the statement that the nurse did not
        have a request from Owens.

A.      I'm not for sure.  I don't' even remember if I called and asked the nurse.  I
        don't know.

Tr. at pgs. 111-14.

Scott testified that when she spoke with Corporal Roy about the situation, he said, "If

[Owens] cannot come to work, then he has to be removed."  Scott testified that she then "sent

another deputy to speak with Mr. Owens, and that's when [she] was told that he couldn't get off his

bunk."  Id. at pg. 108.  Scott testified that she was the one who made the decision to revoke Owens'

trustee status and that she did so because he had started arguing with her about going to work, stating

that it was his day off.  Scott noted, "And while he's arguing with me, he's off of his bunk."  Id. at

pg. 109.  Scott testified as follows in response to the undersigned's questions about her conversation

with Corporal Roy and her decision to remove Owens from trustee status:

Q.      And you told me that Corporal Roy said, "If he can't work, he has to be
        removed."

-10-

A.      Yes

Q.      But in your incident report, you say, "Corporal Roy said he needed to come down to work."

A.      Right

Q.      You didn't say anything about if he can't work, he has to be removed.

A.      Any trustee that can't work, there's no point of them being trustee.

Q.      Has it ever been the case where a trustee might be hurt for a day or two and he's allowed to remain in the trustee pod until he can return to work?

A.      Yes, ma'am.

Q.      So why was Mr. Owens not allowed to do so?

A.      I have no idea.

Q.      Well, you were the one that packed him up and moved him, so why --

A.      He was mainly moved for arguing with me and refusing to go to work. The nurse did not say that he could not work.

Q.      How do you know that? Did you talk to the nurse?

A.      No. It's ... here's her notes.

Q.      You told me you didn't see that before you made your decision.

A.      I did not....

Q.      So why was he not allowed, like other inmates, to have a temporary medical day or two off?

A.      He could have, and that could have been approved....

Q.      But other inmates were allowed to remain on trustee status even if they could not work for a day or two?

A.      I'm sure it's been the – in the past. I don't know of any for a fact.

Q.      And tell me exactly the argument. What happened? What did you go down there and say to [Owens] and what did he say in response?

A.      ... I don't know word for word. I just remember that he was arguing with me, and all I wanted for him to do was to go to work.

Q.      Even if medically he couldn't?

A.      I didn't know medically that he could not go to work. Mr. Owens never told me that he hurt his back.

Q.      But you had been told he couldn't get off his bunk, and Deputy Loudermilk said, "I think he submitted a medical request," and you also have in your report that you were told that he had hurt his back lifting a tea pitcher.... So you did have some notice that he had hurt his back then. Is that correct?

A.      Right.... [but] [w]hen I asked Mr. Owens to come down to work, all he told me was, "Today is my day off." And I understand it is his day off, but we were short [on trustees].

Q.      Okay. But you were on notice that he had hurt his back?

A.      Right.

Id. at pgs. 111-14.

-11-

Scott testified that the block Owens was moved to after his trustee status was revoked, L Block, was not used for disciplinary reasons.  Tr. at pg. 115.  Scott testified that the block was not an open barracks type block; rather, the inmates were housed in cells within the block and they were locked out of their cells the majority of the day.  Id. at pg. 116.

**Corporal Tom Mulvaney**

Mulvaney testified that detainees all wear bracelets with a bar code on it.  Tr. at pgs. 118-119. When detainees are moving around the facility, they scan the bar code so jail personnel know where the inmates are at a given time.  Id.  However, when an individual is moved, that must be entered in the computer or the inmate shows up in the wrong block on the count sheets. Id. at pgs. 122-129. Individual count sheets are created for each inmate.  Id. at pg. 119.   Owens' count sheet for November 4th showed him in L block.  Id. at pg. 122.

Three trustees were working the day shift in B Block on November 4th.  Tr. at pg. 129.  The trustees were David Satterfield, Billy Lehman, and Stephen Green.  Id.

**Jake Loudermilk**

Loudermilk testified that in November of 2009, he was employed at the WCDC as a detention officer.  Tr. at pgs. 23-24.  Loudermilk had no memory of being asked by Scott on November 4, 2009, to remove Owens as a trustee or of Owens' removal from trustee status.  Id. at pgs. 24-25.

Loudermilk testified that he did recall Owens having some type of injury and there being a problem about it but this was the extent of his recollection.  Tr. at pg. 25.  Finally, he indicated that if someone became physically unable to work for more than one day, they would typically be removed from trustee status.  Id. at pgs. 26-27.

**Major Randall Denzer**

Denzer testified he is the jail administrator.  He testified he had examined Owens' file and did not find any grievances or complaints related to his use of the bathroom or being hassled about going to the bathroom.  Tr. at pg. 135.

According to Denzer, the trustees are expected to work their scheduled shifts.  Tr. at pg. 135. Additionally, they are expected to work when requested to do so by a deputy whether or not they are scheduled to work.  Id. at pg. 136.  Denzer testified that the usual practice is that any trustee who does not work is put back in the general population.  Id.

If a trustee becomes physically injured or ill, he is seen by the nurse and she makes the decision of whether or not the trustee is able to work.  Tr. at pg. 137.  If the trustee is not able to work, whether because of an injury or not, this is treated the same as refusing to work and the trustee would be immediately removed from trustee status.  Id.

Denzer was asked to review Owens' medical request of November 2, 2009, in which he stated he had pulled a muscle in his back.  Plff's Ex. 1.  Nurse Bradley wrote on the bottom of the request on November 3rd that Owens had said he "pulled back out of spot picked up tea jug-day before yesterday.  States unable to work." Id.  She prescribed Ibuprofen for three days.  Id.  Denzer testified that the nurse's notations would not remove Owens from work.  Tr. at pg. 138.  Denzer testified that the corporals, sergeants, and the nurse have the ability to remove an inmate from trustee status.  Tr. at pg. 139.

**Corporal Brian Roy**

Roy did not recall Owens hurting his back, speaking to Scott about him on November 4th, or Owens being removed as a trustee.  Tr. at pg. 142. Roy testified he was not over the trustees, but

if one was needed, he selected an inmate for the job.  Id.  Hypothetically, Roy indicated that if he were informed that an inmate hurt his back and could not work, he would take the inmate off trustee status until he was seen by a nurse.  Id.  Once the nurse cleared him for work, he would be back on trustee status.  Id. at pg. 143.

If Scott had informed him that Owens said he hurt his back and did not fill out a medical request, Roy testified his response would be for her to give him a request.  Tr. at pg. 143.  Roy states that he would not have informed Scott to tell Owens that he needed to come down to work anyway.  Id.  Roy would have had the inmate see the nurse before he revoked trustee status.  Id.

**3.  Discussion**

In L.L. Nelson Entrs., Inc. v. City of St. Louis, Mo., 673 F.3d 799, 807-08 (8th Cir. 2012) the court stated that:

> [t]o establish a § 1983 claim for retaliation in violation of the First Amendment, a plaintiff must allege (1) that [he] engaged in a protected activity, (2) that the defendants responded with adverse action that would chill a person of ordinary firmness from continuing the activity, and (3) that the adverse action was motivated at least in part by the exercise of the protected activity.

Id. (internal quotation marks and citations omitted).  "In brief, the plaintiff must show the official took the adverse action because the plaintiff engaged in protected speech."  Revels v. Vincenz, 382 F.3d 870, 876 (8th Cir. 2004).  The filing of a grievance and the filing of a lawsuit are protected First Amendment activities.  Haynes v. Stephenson, 588 F.3d 1152, 1155-56 (8th Cir. 2009).

With respect to the first prong, Owens testified that on October 22, 2009,  he submitted a grievance regarding Scott's behavior when he needed to the use the bathroom that day.   As explained above, the grievance could not be located because, according to Owens, he mailed the original to the Court with a letter requesting a § 1983 form, and neither the grievance nor a copy

thereof were returned to him.   Although no copy of the October 22nd grievance could be located, Owens' § 1983 complaint was stamped received by the Clerk's Office on October 30, 2009, and signed by Owens on October 22, 2009.  Doc. 1.  The account certificate submitted with the *in forma pauperis* application is signed by detention center personnel on October 26th.  Doc. 2.  Owens noted in his complaint that he had sent the original grievance to the Court's Clerk's office to obtain the § 1983 paperwork.  Construing this evidence in the light most favorable to Owens and drawing all inferences in his favor, see Loch v. City of Litchfield, 689 F.3d 961, 965 (8th Cir. 2012), Owens has sufficiently demonstrated for summary judgment purposes that he engaged in protected activity – the filing of a grievance and a lawsuit against Scott – prior to his trustee status being revoked by Scott.

With respect to the second prong, Owens was removed from trustee status by Scott.  This removal meant Owens no longer enjoyed the "perks" of being a trustee.  The removal from trustee status qualifies as an adverse action.  See e.g, Madewell v. Roberts, 909 F.2d 1203, 1206 (8th Cir. 1990)(prison officials may not block reclassification opportunities or worsen plaintiff's living and working conditions in retaliation for their litigation activities).

With respect to the third prong, that the adverse action was causally related to the protected activity, I believe there is a question of fact.  First, to be causally related to the protected activity, Scott, obviously, had to have knowledge of the fact that Owens filed a grievance against her and/or a lawsuit against her.  Scott denied knowing about the October 22, 2009 grievance, but, as detailed above, the Court must accept as true at this stage of the proceedings Owens' testimony that he submitted this grievance and received a response to it.  It can be inferred that Scott learned of the

grievance from other jail staff, as Owens testified that the day after he filed the grievance, Scott took away all of the privileges from the trustees and told them they could thank Owens for it.

As to Scott's knowledge of the lawsuit, Scott initially denied knowing that Owens had sued her until "last year, or maybe the year before last." Scott acknowledged upon further questioning, however, that Owens had – on November 4th, the very day she revoked his trustee status – told her that he was going to sue her. Scott also acknowledged that she had received "second-hand information" from another deputy that Owens "was going to sue" her. Further, in her affidavit submitted in support of the summary judgment motion, Scott stated that she had received "second-hand information" that Owens had, in fact, already filed a lawsuit against her. Thus, the evidence is sufficient to demonstrate, for summary judgment purposes, that Scott knew Owens engaged in protected activity.

As to whether Scott had a retaliatory motive in revoking Owens' trustee status, this motive can be inferred from various circumstances. First, as noted above, Owens testified that the day after he filed the grievance, Scott took away all of the privileges from the trustees and told them they could thank Owens for it. Owens' testimony was corroborated by fellow trustee Madewell. Second, the timing of Owens' removal from trustee status was shortly after he submitted the grievance and § 1983 complaint against Scott. Third, Scott's statement that there were only two trustees working, and, therefore, they needed Owens to work even though it was his day off, is inconsistent with Owens' testimony that there were already three trustees working. It appears that Owens' testimony in this regard is corroborated by the testimony of Corporal Mulvaney, who identified, through jail records, three trustees working the day shift in B pod on the date in question. In any event, no evidence was introduced to establish that Owens was cleared for work. The nurse's notes do not

indicate one way or the other whether Owens was cleared to return to work, and there was inconsistent testimony as to whether a trustee's status would be revoked if he could not work due to medical reasons.  Scott herself admitted that she was on notice that Owens had claimed to have hurt his back (yet she made no attempt to confirm this with the nurse)  and that trustees had been allowed in the past to take a day or two off for medical reasons.  When asked why Owens was not allowed a temporary medical leave, Scott responded, "I have no idea," and "that could have been approved," yet she decided to revoke Owens' trustee status because he had argued with her about working.  While Scott contended that Further, as detailed above, Scott made inconsistent statements in her affidavit, her incident report and her testimony.   Scott's incident report contains statements allegedly made by Roy.  Roy, however, testified he would not have told Scott to have Owens go to work until they received a determination from the nurse regarding his ability to work.  Based on the evidence presented, I believe the jury could conclude Owens' removal from trustee status was causally related to Owens' right to file grievances and lawsuits.

I next turn to the question of whether or not Scott is entitled to qualified immunity. "Qualified immunity shields government officials from liability in a § 1983 action unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known."  Brown v. City of Golden Valley, 574 F.3d 491, 495 (8th Cir. 2009).

The qualified immunity inquiry consists of two questions:  "(1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct."  Johnson v. Carroll, 658 F.3d 819, 825 (8th Cir. 2011).  "Unless the answer to both of these questions is yes, the defendants are entitled to qualified immunity."  Langford v. Norris, 614 F.3d 445, 459 (8th Cir. 2010).

As discussed above, there is an issue of fact as to whether the adverse action taken against Owens was in retaliation for having filed grievances and a lawsuit. "A prisoner's right under the First Amendment to petition for redress of grievances under a prison's grievance procedures is clearly established in this court" and has been "for over twenty years." Nelson v. Shuffman, 603 F.3d 439, 449 (8th Cir. 2010); see also Sprouse v. Babcock, 603 F.3d 439, 449 (8th Cir. 1980)(recognizing the First Amendment to petition for redress of grievances includes redress under established grievance procedures). Scott is not entitled to qualified immunity.

Finally, Scott argues in her summary judgment motion that Owens cannot recover compensatory damages because he has not alleged an actual physical injury. Scott is correct. Owens acknowledged in an addendum to his complaint that he did not suffer any physical harm from Scott's alleged retaliatory conduct. (Doc. 5 ¶ 4.) The Prison Litigation Reform Act (PLRA) limits inmates' recovery "for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e). The PLRA's limitation on damages applies to all prisoner lawsuits, including claims alleging retaliation. See Royal v. Kautzky, 375 F.3d 720, 723 (8th Cir. 2004), cert. denied, 544 U.S. 1061 (2005). Accordingly, the undersigned finds that Scott is entitled to summary judgment on Owens' claim for compensatory damages. Nominal damages, however, as well as punitive damages, if supported by the evidence, may still be awarded. See id., 375 F.3d at 723.

### 4.  Conclusion

For the reasons stated above, I recommend that Scott's summary judgment motion **(Doc. 49)** be **GRANTED** as to Owens' claim for compensatory damages, but be denied in all other respects. This leaves for a jury trial Owens' retaliation claim against Scott in her individual capacity for

-18-

nominal damages.  While Owens did not specify in his complaint whether he is seeking punitive damages, the possibility of such an award is not, at this juncture, precluded.  See Bowles v. Osmose Utils. Servs., Inc., 443 F.3d 671, 675 (8th Cir. 2006) (affirming award of punitive damages even though complaint did not ask for such damages; Federal Rule of Civil Procedure 54(c) provides that "every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in the party's pleadings"; defendant was not unfairly surprised, as plaintiff filed a document three weeks before trial notifying defendant of intent to seek punitive damages).

**The parties have fourteen (14) days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 17th day of October 2012.

/s/ Erin L. Setser
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE